IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| VEIMER RODRIGUEZ | : | NO. 2:08-cr-00061-LDD-3 |

Legrome D. Davis, J.                                    September 8, 2009

<u>MEMORANDUM</u>

Presently before the Court is the issue of Defendant Veimer Rodriguez's competency to stand trial.  Following a hearing conducted to determine Defendant Veimer Rodriguez's competency to stand trial and upon consideration of Defendant Veimer Rodriguez's Memorandum in Support of Position that Defendant Rodriguez is Incompetent to Stand Trial (Doc. No. 75) and the Government's Memorandum in Support of a Finding of Mental Competency (Doc. No. 76), we find Defendant Veimer Rodriguez incompetent to stand trial for the reasons that follow.

I.      FACTUAL BACKGROUND

   A.      Procedural History and Summary of Expert Reports

Of January 31, 2008, Defendant Veimer Rodriguez ("Rodriguez") was charged in an indictment with one count of conspiracy in violation of 18 U.S.C. § 371, two counts of dealing in counterfeit currency in violation of 18 U.S.C. § 473, and aiding and abetting in violation of 18 U.S.C. § 2.  When the defense raised concerns as to Rodriguez's competency to stand trial, Steven E. Samuel, Ph.D. ("Dr. Samuel"), performed a psychological evaluation of Rodriguez on June 12, 2008 upon request of defense counsel.  (Dr. Samuel Report 1.)  Dr. Samuel submitted

1

his expert report on June 26, 2008.  (Id.)

In his report, Dr. Samuel concluded that Rodriguez is incompetent to stand trial.  He based this conclusion on the following findings.  He found that, with a full-scale IQ score of 56, Rodriguez "is operating in the Mild Mental Retardation range of intelligence" and stated that this condition "is permanent."  (Id. at 5-6.)  He also concluded that Rodriguez's "short-term memory functioning is moderately impaired whereas his long-term memory functioning is variable, with these scores ranging between borderline to moderately impaired" and that there was "no reason to conclude that . . . Rodriguez's memory abilities would significantly, or spontaneously, improve at some point in the future."  (Id. at 6.)  Following the administration of the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST*MR"), Dr. Samuel determined that Rodriguez's "profile is consistent with mentally retarded [defendants] who are not competent to proceed to trial" mainly due to his "fundamental [inability] to make the specific decisions regarding his defense."  (Id.)  The CAST*MR also revealed that Rodriguez is "easily manipulated and [misled]" and that he misunderstands many of the concepts and roles of persons involved in the trial process.  (Id. at 6-7.)  These results led Dr. Samuel to conclude that Rodriguez does not have the "ability to consult rationally with [defense counsel] nor the sufficient present ability to work with [defense counsel]" and that therefore he was incompetent to stand trial.  (Id. at 6.)

Following the submission of Dr. Samuel's report, Rodriguez then underwent an examination by Frank M. Dattilio, Ph.D. ("Dr. Dattilio"), and Robert L. Sadoff, M.D. ("Dr. Sadoff"), upon request of the Government.  Dr. Dattilio engaged in a psychological evaluation of Rodriguez on November 19, 2008 and December 19, 2008, while Dr. Sadoff conducted a

2

psychiatric examination on November 19, 2008.  (Dr. Dattilio Report 1-2; Dr. Sadoff Report 1.)

Dr. Dattilio and Dr. Sadoff submitted their expert reports on December 22, 2008 and December

23, 2008, respectively.  (Dr. Dattilio Report 1; Dr. Sadoff Report 1.)

   Dr. Dattilio performed many of the same tests as Dr. Samuel but came to the conclusion

that Rodriguez is "marginally competent."  (Dr. Dattilio Report 10.)  Dr. Dattilio found that

Rodriguez's full-scale IQ score of 69 places him "right on the crest between the mild mentally

retarded range and the borderline range of intellectual functioning" but that his "true score

hovers in the low end of the borderline range."  (Id. at 7.)  To account for the difference between

his results and the results of Dr. Samuel, Dr. Dattilio explained that he used the Spanish version

of the Wechsler Abbreviated Scales of Intelligence, while Dr. Samuel used the English version,

and that Dr. Dattilio calculated Rodriguez's score based on Rodriguez's true age of 42, while Dr.

Samuel thought Rodriguez's age was 46.  (Id. at 8.)  Dr. Dattilio also administered the Spanish

version of the CAST*MR test.  (Id. at 9.)  Rodriguez scored higher than he did previously with

Dr. Samuel, getting 64% correct with respect to questions regarding basic legal concepts, 40%

correct with respect to questions in the area of skills to assist his attorney, and 100% correct with

respect to questions related to his understanding of case events.  (Id. at 9-10.)  Dr. Dattilio also

agreed with Dr. Samuel that Rodriguez is susceptible to manipulation by others but attributed

much of this problem to "emotional and cultural dependence, as opposed to his cognitive deficits

and inability to make decisions for himself."  (Id. at 11-12.)  He also noted that Rodriguez "may

be functioning at a high enough level to know that if he 'plays dumb' in responding to some of

the competency questions, this may certainly help his case."  (Id. at 12.)  Based on his

evaluation, Dr. Dattilio concluded that Rodriguez, "while suffering from clear cognitive deficits

and some memory impairment, is considered marginally competent." (Id.) He further indicated that Rodriguez might "be amenable to competency restoration" to overcome any difficulties Rodriguez experienced with competency. (Id. at 10, 12.)

In his own report, Dr. Sadoff concurred with Dr. Dattilio's conclusions. He specifically stated that Rodriguez "know[s] the nature and consequences of his current legal situation and has some concept of what goes on in court, though he has some misunderstandings about the role of the jury and the role of the prosecutor." (Dr. Sadoff Report 8.) Dr. Sadoff concluded however that any misunderstandings were "more educational issues than they [were] mental health issues and [could] be restored through educational rehabilitation prior to trial." (Id.) He further found that Rodriguez's "ability to work with counsel" constituted "an issue that needs to be addressed," though with "proper education and training, it was likely . . . that . . . Rodriguez would achieve [this] ability." (Id.)

After the submission of Dr. Dattilio's and Dr. Sadoff's reports, the parties agreed to enroll Rodriguez in a competency restoration process performed by Alex M. Siegel, J.D., Ph.D. ("Dr. Siegel"). Dr. Siegel met with Rodriguez for four treatment sessions on April 3, 2009, April 10, 2009, April 17, 2009, and April 29, 2009. (Dr. Siegel Report 1, 6.) Dr. Siegel submitted his expert report on May 1, 2009. (Id. at 1.)

After Dr. Siegel's initial assessment of Rodriguez, he concluded that Rodriguez was "marginally competent to proceed to trial" but that he was "an appropriate candidate for a brief intensive treatment to restore his competency to stand trial." (Id. at 5.) In crafting a specific competency restoration treatment plan, Dr. Siegel "focused on two general interventions": (1) "a structural cognitive problem-solving approach to help [Rodriguez] communicate more rationally

4

and factually with his attorney as well as understand the consequences of the possible outcomes at his trial," and (2) "a psychoeducational intervention using a model of a courtroom with discussions to teach [Rodriguez] the roles of the courtroom personnel and the courtroom procedure."  (Id. at 6.)

Throughout this process, Dr. Siegel made many observations about Rodriguez.  First, Dr. Siegel learned that Rodriguez is better able to learn when the discussion focused on a hypothetical defendant; "when the examiner focused the questions on [Rodriguez] as a defendant, [Rodriguez] became more flustered and confused."  (Id.)  Dr. Siegel attributed this reaction to Rodriguez's inability to comprehend potential negative consequences or outcomes. (Id.)  Second, Dr. Siegel concluded that Rodriguez is capable of learning and understanding things with time and practice.  (Id. at 1, 9.)  To support this conclusion, Dr. Siegel pointed to the fact that Rodriguez got lost on his first solo visit to his office, though he had already made two prior visits with his attorney to see Dr. Siegel, but managed to find the office on his next visit. (Id.)  Finally, Dr. Siegel noted that Rodriguez "is trusting of 'authority figures' and people he perceives as friends," resulting in his easy "manipulation by others."  (Id. at 9.)  Thus, Rodriguez "may acquiesce rather than fully understanding what is going on around him or fully understand[ing] what others are asking of him."  (Id.)

Following the completion of the competency restoration treatments, Dr. Siegel administered the English version of the CAST*MR test.  (Id. at 8.)  Rodriguez got 76% correct with respect to questions regarding basic legal concepts, 67% correct with respect to questions in the area of skills to assist his attorney, and 97% correct with respect to questions related to his understanding of case events.  (Id.)  Dr. Siegel also stated that Rodriguez's understanding of the

courtroom personnel and the courtroom process had been increased" and that "Rodriguez was able to give enough details surrounding his arrest" to suggest his ability "to communicate with his counsel and assist him in his defense." (Id. at 9-10.)  Therefore, Dr. Siegel concluded that Rodriguez is now fit to stand trial.  (Id. at 10.)

This Court then held a hearing to assess Defendant Rodriguez's competency to stand trial on May 12, 2009.  Dr. Sadoff, Dr. Siegel, and Defendant Rodriguez testified at this hearing.

B.    Factual Findings

This Court makes the following findings from the record based on a preponderance of the evidence.  Defendant Rodriguez is a 42-year-old man who lived in Cali, Colombia until around the age of 20 when he immigrated to the United States.  (Dr. Samuel Report 2; Dr. Dattilio Report 3-4; Dr. Sadoff Report 1.)  Rodriguez was the second oldest of four children and was primarily raised by his mother.  (Dr. Samuel Report 2; Dr. Dattilio Report 3; Dr. Sadoff Report 2-3.)  His father was an alcoholic who left the family on several occasions but was intermittently involved.  (Dr. Samuel Report 2; Dr. Dattilio Report 3-4; Dr. Sadoff Report 2.)  Rodriguez stopped going to school after completing the third or fourth grade around the age of 13 or 14 because he needed to make a financial contribution to the family.  (Dr. Samuel Report 2; Dr. Dattilio Report 4; Dr. Sadoff Report 3.)  Rodriguez has worked as a mechanic, a cleaner, and a landscaper but has spent most of his time as a house painter.  (Dr. Dattilio Report 2; Dr. Sadoff Report 3.)  Rodriguez speaks, reads, and writes in Spanish, but cannot read or write in English. (Dr. Dattilio Report 3; Dr. Sadoff Report 3.)  Though he can speak a limited amount of English, Rodriguez is not conversant in this language.  (Dr. Samuel Report 2; Dr. Dattilio Report 3; Dr. Sadoff Report 3.)

After coming to the United States, Rodriguez met a woman named Jessica whom he eventually married.  (Dr. Dattilio Report 4-5; Dr. Sadoff Report 1.)  Rodriguez and Jessica had a son named Veimer III who is now seventeen years old.  (Dr. Dattilio Report 5; Dr. Sadoff Report 1.)  Rodriguez and Jessica divorced after approximately five years of marriage, but Rodriguez still sees his son Veimer regularly.  (Dr. Dattilio Report 5-6; Dr. Sadoff Report 1.)  Years later, Rodriguez met a woman named Sonia with whom he has lived for about ten years.  (Dr. Dattilio Report 5; Dr. Sadoff Report 1.)  Rodriguez and Sonia had a son named Anthony who is now almost three years old.  (Dr. Dattilio Report 5; Dr. Sadoff Report 1.)  After criminal charges were brought against Rodriguez, he lost his job.  (Dr. Dattilio Report 6; Dr. Sadoff Report 6.)  When Rodriguez and Sonia were forced to give up the apartment they shared, Sonia took Anthony to live in a very small apartment.  (Dr. Dattilio Report 6; Dr. Sadoff Report 6.)  Because the apartment was too small for Rodriguez to also occupy it, he went to live with his mother, though he stills sees Sonia and Anthony daily.  (Dr. Dattilio Report 5-6; Dr. Sadoff Report 1.)

About a year before the charges in this case were brought, Rodriguez met a man named Jazon Dussan ("Dussan") when Dussan delivered a pizza to his home.  (Dr. Sadoff Report 4-5.)  Dussan befriended Rodriguez, took him out to eat on several occasions, and even lent him money.  (Dr. Samuel Report 3-4; Dr. Dattilio Report 6; Dr. Sadoff Report 5.)  Rodriguez wanted Dussan to like him, and when Dussan asked Rodriguez to do him a favor by bringing some money to another person, Rodriguez obliged.  (Dr. Samuel Report 3-4; Dr. Dattilio Report 6; Dr. Sadoff Report 3-4.)  During the second transfer that Rodriguez made for Dussan, Rodriguez was arrested.  (Dr. Samuel Report 3; Dr. Dattilio Report 6; Dr. Sadoff Report 5.)

Following the initiation of criminal charges against Rodriguez, an evaluation of his

7

competency to stand trial began.  Based on the reports submitted by the four experts who examined Rodriguez and based on the testimony that Dr. Sadoff, Dr. Siegel, and Rodriguez gave to this Court during the May 12, 2009 hearing, many facts related to Rodriguez's competency to stand trial are apparent.

Rodriguez says that he "has been slow since he was born," (Dr. Sadoff Report 4), but this condition has been compounded by several head injuries throughout his lifetime, (Dr. Samuel Report 2-3; Dr. Dattilio Report 4-5; Dr. Sadoff Report 2, 4).  While living in Colombia as a young child, Rodriguez was severely beaten by thieves who invaded his family home.  (Dr. Sadoff Report 2.)  At the age of 18 while still living in Colombia, Rodriguez was involved in a motorcycle accident in which he experienced a head injury resulting in loss of consciousness and hospitalization for one day.  (Dr. Samuel Report 3; Dr. Dattilio Report 4; Dr. Sadoff Report 4.) Finally, about six years ago in the United States, Rodriguez was hit by a motor vehicle while crossing the street.  (Dr. Dattilio Report 5; Dr. Sadoff Report 4.)  He sustained a head injury, lost consciousness, and spent a week in the Temple University Hospital.  (Dr. Dattilio Report 5; Dr. Sadoff Report 4.)

Whether due to a congenital condition or a later head trauma, Rodriguez clearly suffers from several cognitive deficiencies.  Rodriguez has an IQ score that places him between the mild mentally retarded range and the borderline range of intellectual functioning.  (Dr. Samuel Report 5-6; Dr. Dattilio Report 7.)  Rodriguez also struggles with his long- and short-term memory, both of which are significantly impaired.  (Dr. Samuel Report 6; Dr. Dattilio Report 8-9.)  Because Rodriguez's limitations in intelligence and memory are permanent conditions, there is no reasonable expectation that any of these deficiencies would improve with time or effort.  (Dr.

Samuel Report 6.)

These impairments acting together serve as a serious impediment to Rodriguez's ability to learn new things.  (Id.)  Because Rodriguez lives with limited intellectual functioning, he learns through repetitive experiences.  (Competency Hr'g N.T. 40:6-9, May 12, 2009.)  But even once Rodriguez manages to take in new information or new concepts, he is apt to forget what he has learned at some point in the future due to his memory issues.  (Dr. Samuel Report 6.)  Rodriguez's learning disability is clearly demonstrated by his difficulties in finding Dr. Siegel's office on his own even though his counsel had brought him to the office for two prior appointments.  (Dr. Siegel Report 1.)  Not only did Rodriguez get lost, but he ended up in Conshohocken, PA about ten miles away from Dr. Siegel's office in Narberth, PA.  (N.T. 112:10-20.)  Though Rodriguez eventually arrived at Dr. Siegel's office about half an hour late, he only found his way because his counsel was on the phone directing him where to go.  (Id. at 113:3-8.)  The next week, Rodriguez found his way to the office; however, he had forgotten that there was no appointment scheduled that week.  (Id. at 113:9-13.)

Rodriguez's cognitive and intellectual deficiencies also make it especially difficult for Rodriguez to grasp abstract concepts.  While Rodriguez is relatively proficient in recounting concrete factual occurrences he has experienced, he is frequently stumped when faced with abstractions.  For example, during the competency hearing held on May 12, 2009, Rodriguez freely discussed the facts surrounding his arrest and subsequent indictment before the Court.  (N.T. 140:24-144:23.)  However, once the questioning turned from the concrete to the abstract, Rodriguez clearly struggled, especially when discussing legal concepts.  Thus, despite the fact that he had discussed the concept of pleading guilty with Dr. Siegel, (Dr. Siegel Report 8),

Rodriguez told the Court that he did not "understand what it means," (N.T. 134:4-6).  Rodriguez further told the Court that he thinks that his counsel, Jose Ongay ("Ongay"), is like a judge in that "he tries to see who's good, and who's bad, and that way he can, you know, find them guilty or defend them."  (Id. at 155:20-22.)  Rodriguez also adheres to the false idea that the Court must find someone responsible for the offenses charged and that, because he believes Dussan "flew the coop," the Court must find Rodriguez guilty.  (Id. at 39:1-9, 163:22-25; see also Dr. Sadoff Report 5.)

Not only does Rodriguez struggle to grasp abstract concepts, but he particularly has difficulty in applying those concepts to his personal situation.  This is because Rodriguez cannot effectively contemplate negative consequences.  Thus, when Dr. Siegel attempted to restore Rodriguez's competency, he found that he needed to use hypothetical defendants to teach Rodriguez about the trial process.  (N.T. 99:7-13; Dr. Siegel Report 6.)  If he used questions that explicitly identified Rodriguez as the defendant, Rodriguez would become "flustered and confused."  (Dr. Siegel Report 6.)  Similarly, Rodriguez would not discuss with Dr. Siegel the potential negative outcomes that his son, Veimer, could face from complications following a kidney transplant.  (N.T. 99:23-100:23; Dr. Siegel Report 6.)  While Rodriguez could discuss his son's illness and recent hospitalization, he could not "comprehend the potential negative consequences of his son not getting better," the same way he "could not . . . look at the negative consequences . . . [of] his trial."  (Dr. Siegel Report 6.)

Another weakness relevant to Rodriguez's competency is the fact that he frequently defers to people he perceives to be more intelligent than he is.  (N.T. 40:19-41:9; Dr. Samuel Report 2; Dr. Dattilio Report 12; Dr. Siegel Report 9.)  As a result, Rodriguez will change his

answers even to questions for which he has an informational advantage over the examiner.  After Rodriguez told Dr. Samuel he immigrated to the United States about eighteen years ago, Dr. Samuel told him that he had read that Rodriguez came to the country twenty years ago to which Rodriguez replied, "[Y]ou are more intelligent.  That is right."  (Dr. Samuel Report 2.) Additionally, once Rodriguez told Dr. Samuel that he thought his birth date was September 15, 1966, Dr. Samuel responded that he thought Rodriguez's birth date was actually September 15, 1965.  (Id.)  Even though that information was incorrect, Rodriguez agreed that Dr. Samuel "could be right" because he was "more intelligent."  (Id.)  This deference displayed by Rodriguez allows him to be easily manipulated and misled by many people as he views most people to be more important and intelligent than he is.  (Id. at 7.)  This is especially true in the courtroom where he views the judge as "a great man . . . kind of like the king," and the prosecutor as "a very important individual."  (N.T. 152:21-153:5, 155:25-156:15.)  Although Rodriguez may defer to others partially as a consequence of his culture, (Dr. Dattilio Report 12), his tendency to defer is also a consequence of his cognitive and intellectual deficiencies and a lifetime of knowing he is slow compared to others, (N.T. 164:15-22; Dr. Sadoff Report 4; Dr. Siegel Report 9).

These impairments are not caused by psychiatric conditions such as schizophrenia or manic depression that could be treated with medication.  (N.T. 34:18-21, 42:7-8.)  Though Rodriguez is suffering from depression and anxiety, these disorders are either related to the pending charges against him or his prior life in Colombia and are not responsible for his cognitive impairments.  (Id. at 27:6-15, 34:22-35:6.)

Our findings with respect to Rodriguez's cognitive and intellectual deficiencies and the

impediments resulting therefrom are entirely consistent with our observations of Rodriguez at the competency hearing.  Throughout the daylong hearing, Rodriguez's expression was blank and gave no visible manifestation of comprehension.  When he stepped up to be sworn in as a witness, he kept his hand raised in the air, even after completion of the oath, until he was explicitly told to put it down.  (Id. at 132:7-22.)  As he was testifying, Rodriguez's deficiencies became even more pronounced.  Rodriguez had limitations in his ability to respond rationally to the questions posed to him.  For example, when the Court explained to Rodriguez that the black robes signified the identity of the judge, Rodriguez responded, "I don't know if that's a disguise that you're wearing."  (Id. at 153:6-9.)  Furthermore, Rodriguez frequently demonstrated memory lapses to the extent that he could not even remember his address, his age, or his birthday.  (Id. at 135:14-15, 148:15-149:19.)  Although he was responsive and communicative with the Court throughout his testimony, he was perceptibly confused as to what was going on and did not understand the purpose of the hearing and its corresponding questions.  (Id. at 166:11.)

Moreover, throughout our communications with Rodriguez, it was clear that he was not "playing dumb" in responding to our questions.  Rather, he is a sincere individual who was presenting genuine deficiencies with which he has struggled for a long time.  Therefore, we do not find persuasive Dr. Dattilio's suggestion that Rodriguez may be "malingering to some degree" or that he may be functioning at an intellectual level that is high enough "to discern that answering questions incorrectly [will] help his case, and perhaps, possibly help him to avoid a negative impact in court."  (Dr. Dattilio Report 12.)  Beyond noting that Rodriguez's IQ scores may indicate that he is intelligent enough to feign ignorance, Dr. Dattilio did not base his

conclusion that Rodriguez may be engaging in deception on his own observations or his own

tests.  On the contrary, to support such a weighty determination, Dr. Dattilio primarily relied on

Dr. Samuel's report:

> [O]n the top of page 5 of Dr. Samuel's report, it is stated that
> [Rodriguez's] legal counsel, Attorney Ongay, indicated that
> [Rodriguez's] mother and niece stated to him that [Rodriguez] did not
> have a problem with his cognition.  This is quite telling in that these
> two individuals who are used to spending ample time with him and
> would have a more accurate frame of reference as to his strengths and
> weaknesses. . . .  In addition, . . . in his report, Dr. Samuel alluded to
> administering the SIRS, which is an instrument used to determine
> deception and malingering, however, there was no elaboration on the
> results, nor his interpretation of such.  In addition, the raw data from
> this test was not included in the packet that I received along with his
> report.

(Id.)  Dr. Dattilio's reliance on Dr. Samuel's report to conclude that Rodriguez may be

malingering is troubling.  First, simply criticizing Dr. Samuel's report for failing to provide

sufficient elaboration to support one conclusion does not, without more, dictate the truth of the

opposite conclusion.  Second, although Dr. Samuel did note that Rodriguez's mother and niece

told Ongay that Rodriguez did not have a cognition problem, Ongay also said that "Rodriguez's

family did not allow him to talk . . . without a family member present."  (Dr. Samuel Report 4.)

This behavior seems to indicate that the mother and niece knew that they needed to keep an eye

on Rodriguez, a precaution that would likely be unnecessary if Rodriguez's cognitive

functioning were normal.  Thus, we find Dr. Dattilio's conclusion that Rodriguez may be

"playing dumb" to be unsupported and contrary to our own observations.

All of the impairments identified above persist despite Dr. Siegel's attempt at

competency restoration.  Relying on the reports submitted by Dr. Samuel, Dr. Dattilio, and Dr.

Sadoff, Dr. Siegel stated in his report that he crafted a strategy at restoring Rodriguez to

competency that focused on two general interventions: (1) developing a "structural cognitive problem-solving approach to help [Rodriguez] communicate more rationally and factually with his attorney as well as understand the consequences of the possible outcomes at trial" and (2) engaging in a "psychoeducational intervention using a model of a courtroom with discussions to teach [Rodriguez] the roles of courtroom personnel and the courtroom procedure." (Dr. Siegel Report 6.)

Despite this claimed two-pronged approach, Dr. Siegel's method truly focused on educating Rodriguez about legal concepts and about the roles of courtroom personnel. When recounting the results of his treatment, Dr. Siegel stated in his report that Rodriguez "was able to demonstrate that he had a better understanding of the courtroom personnel, the courtroom process and his ability to assist counsel in his defense." (Dr. Siegel Report 9.) To support this statement, Dr. Siegel specifically listed in his report what Rodriguez had accomplished:

> Rodriguez was able to identify and articulate all the personnel who are involved in a trial. For example, he knows what the judge, the jury, the witness, the defense attorney and the prosecuting or accusing attorney do during a trial. He understands the concept of guilt and innocence. He understands that if someone is found guilty, that they were proven to have committed a crime. He understands that if someone is found innocent, it means they did not commit the crime and are released. He understands the concept that if someone is found guilty, a judge can sentence that individual to jail or fine him. He understands the concept of motive and how that may figure into a decision being made about the individual's guilt or innocence. He understands the jury listens to the evidence and decides who they believe. Finally, he understands the judge is in charge of the courtroom and passes the verdict as to the guilt or innocence of the defendant.

(Id.) All of these accomplishments are educational, and it is not clear how Dr. Siegel helped Rodriguez engage in problem solving that would help him assist his attorney or understand the

potential outcomes at trial as described by prong one of Dr. Siegel's two-pronged approach to restoring Rodriguez's competency.  When the Court sought clarification of Dr. Siegel's processes in helping Rodriguez solve problems, Dr. Siegel gave an example where he taught Rodriguez the concept of minimum and maximum time and the difference between felonies and misdemeanors.  (N.T. 104:7-105:14.)  But again, this is simply education.  Surely, to rationally solve any problem, education is an essential part of the process, but for someone with Rodriguez's cognitive impairments, it is not sufficient.  Thus, Dr. Siegel did not successfully address many of Rodriguez's limitations that relate to his competency to stand trial.

Moreover, while Dr. Siegel had some success in educating Rodriguez on the courtroom personnel and courtroom procedures, any success was incomplete and temporary.  There are still major legal concepts that were explained to Rodriguez that he simply does not comprehend.  For example, despite Dr. Siegel's attempts, Rodriguez cannot grasp the idea of plea bargaining because, as Dr. Siegel explained, "it's an abstract concept that he could not understand."  (N.T. 120:16-122:17.)  Other important legal concepts were never explained to Rodriguez and therefore remain a mystery to him.  Some of these concepts include his right to testify in his own defense and his ability to participate in jury selection.  (Id. at 122:18-22, 124:14-125:1.)  Furthermore, where Rodriguez could recall legal concepts that were taught to him, it is not always clear whether Rodriguez truly has some understanding of these concepts or whether he is simply regurgitating the information that has been repeatedly recited to him.  Finally, for any concept that Rodriguez did manage to learn, there is no guarantee that he will retain their meaning.  Dr. Siegel speculated that Rodriguez would only remember the information imparted to him for "the foreseeable future," which he defined as merely "two or three weeks."  (N.T.

15

101:21-103:3.)  We observed however that Rodriguez had already begun to forget key concepts at the time of the competency hearing.  For instance, Dr. Siegel recounts in his report that Rodriguez learned by the end of his treatment that the prosecutor was "not on [his] side" and that it was the prosecutor's job "to provide evidence against [him]."  (Dr. Siegel Report 7.) However, at the competency hearing, Rodriguez seemed to think that the prosecutor had a more neutral role.  When he was asked whether the prosecutor was on his side or against him, Rodriguez responded that he didn't know "if [the prosecutor] believes [him] or if he doesn't." (N.T. 158:2-8.)  Rodriguez concluded that the prosecutor "is for the person that speaks the truth."  (Id. at 158:9-11.)  He no longer remembered that the prosecutor was the one bringing the charges against him.  (Id. at 159:13-21; 160:5-10.)

For these reasons, we find that Dr. Siegel's processes did not produce the restoration of Rodriguez's competency he claims in his report.  We recognize here that competency restoration is not an exact science.  There are no definite psychological standards, no required steps or processes, and no single test to determine success or failure.  (Id. at 42:11-43:13; 85:16-87:8.) However, we especially note that patients like Rodriguez who demonstrate low cognitive functioning prove a special challenge for competency restoration as there are serious limitations with respect to improving cognitive understanding.  (Id. at 43:14-24.)  Dr. Siegel could not overcome this challenge, and therefore we find that the cognitive and intellectual impairments that inhibit Rodriguez's competency were not restored.

## II.    LEGAL ANALYSIS

A fundamental aspect of our adversarial system of justice is the prohibition against subjecting to trial an incompetent person.  Drope v. Missouri, 420 U.S. 162, 171 (1975).  Any

failure in observing this fundamental prohibition results in the deprivation of the incompetent defendant's due process right to a fair trial.  Id. at 172 (citing Pate v. Robinson, 383 U.S. 375, 385 (1966)).  Accordingly, the Supreme Court has developed the following two-prong test to adequately protect this important right: a defendant is competent to stand trial in federal cases if (1) the defendant has the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) the defendant "has a rational as well as factual understanding of the proceedings against him."  Id. (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  This two-prong test is reflected in 18 U.S.C. § 4241, which provides that a finding of incompetency to stand trial is appropriate where "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(d).

In determining whether a defendant satisfies these two prongs, "a court must consider a number of facts, including: 'evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial.'"  United States v. Leggett, 162 F.3d 237, 242 (3d Cir.1998) (alteration in original) (quoting Drope, 420 U.S. at 180).  However, "even one of these factors standing alone may, in some circumstances, be sufficient."  Drope, 420 U.S. at 180.  Moreover, "there are no fixed or immutable signs," id., nor is there any "predetermined formula," Leggett, 162 F.3d at 242, with which to invariably resolve the competency issue.  Rather, "the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated."  Drope, 420 U.S. at 180.

17

Looking at Rodriguez's impairments in totality, we find Rodriguez to be incompetent to stand trial. We make this determination because Rodriguez's cognitive and intellectual limitations prevent him from being able to assist properly in his defense. In addressing this element of competency, the Government asserts that Rodriguez is capable of providing "the necessary 'assistance to counsel' under the law" simply because Rodriguez has the "ability to understand the nature of his wrongdoing" and has the "strong ability to recount the factual events leading to his arrest." (Gov't Mem. Supp. Mental Competency 14-15.) The Government argues that this is especially true because the issues involved in Rodriguez's case are not complex. (Id. at 14 n.6.) Although the defendant's ability to recite the facts of his case and the complexity of the issues raised by a defendant's defense are considerations in our competency analysis, these factors are only two of many considerations that we examine. See Dusky, 362 U.S. at 402 (finding that the fact that the defendant is "oriented to time and place" and has "some recollection of events" is insufficient to establish competency to stand trial). Therefore, we believe however that the Government's view of a defendant's role in assisting his counsel is inadequate.

While we agree that one of Rodriguez's greatest strengths lies in his ability to discuss the facts of his case, we also recognize that Rodriguez suffers from many impairments that inhibit his ability to use his knowledge of the facts to assist counsel. Because of his cognitive and intellectual limitations, Rodriguez only learns through repetitive experiences and thus has trouble processing events as they occur. (N.T. 39:24-40:18.) Therefore, at trial where information will be stated once and placed on the record as evidence against him, Rodriguez will not have the benefit of a patient individual who can explain to him again and again what is

18

occurring and what is being said.  As a result, he will not be able to respond to events as they

transpire in the courtroom, and he will not be able to use his knowledge of the facts to assist his

counsel at trial.

Rodriguez's limited ability to follow the action in the courtroom is evidenced in the

following testimony at the competency hearing:

| Court: | And so this is . . . your opportunity to ask me any questions that you might have about what happened today, because we've been all together all day. |
|---|---|
| Rodriguez: | I didn't know what happened. |
| Court: | You don't know what happened? |
| Rodriguez: | It's always, you know, I keep getting asked all kinds of questions.  It's always been the same thing. |
| Court: | Right, but do you want to ask me any questions? |
| Rodriguez: | But what could I possibly ask you? |

(Id. at 166:7-18.)  Rodriguez processed very little of what had occurred at the competency

hearing.  Indeed, he did not even seem to comprehend what the purpose of the hearing was or

why he had been questioned by so many people.  This competency hearing lasted an entire day,

but a trial will be much longer.  Any trial will involve many more witnesses and will progress

through multiple stages.  The issues at the hearing were limited to Rodriguez's competency, but

a trial will be more complicated as the prosecutor tries to prove various elements of multiple

crimes.  If Rodriguez cannot even deduce the purpose of the competency hearing, we have

significant reservations about Rodriguez's ability to process the events at trial.

Furthermore, we are also concerned with Rodriguez's willingness to accept as true

factual averments made by witnesses who testify against him.  Because Rodriguez may perceive

many of the witnesses to be more intelligent than he is and because he tends to defer to the views

of such persons, (id. at 40:19-41:9), he is likely to defer to their testimony and accept it as true

19

even when he previously knew it to be wrong.  In such instances, Rodriguez would not vocalize his opposition to the witness's testimony, and therefore his knowledge of the facts would be useless to his attorney.  This conduct would not only restrict his ability to assist his attorney but would also carry the possibility of actively damaging his defense.

A defendant is not merely responsible for dispensing factual information to his attorney; he is also responsible for making many decisions throughout the course of a criminal matter. Godinez v. Moran, 509 U.S. 389, 398 (1993) (noting that "*all* criminal defendants . . . may be required to make important decisions once criminal proceedings have been initiated" and suggesting that courts should consider a defendant's decisionmaking capacity when evaluating competency to stand trial).  Some strategic decisions may ultimately be made by counsel, though the wishes of the defendant may influence counsel's choices.  Other decisions are solely within the authority of the defendant, though counsel may play an advisory role.  In either situation, Rodriguez will be seriously disabled from either engaging in himself or assisting his attorney in engaging in rational decisionmaking.

Indeed, the Supreme Court in Godinez listed certain critical choices that a criminal defendant must make either leading up to or at trial, including (1) the decision to "waive his privilege against compulsory self-incrimination by taking the witness stand"; (2) the decision to "waive his right to trial by jury" by pleading guilty for example; (3) the decision to "waive his right to confront his accusers by declining to cross-examine witnesses for the prosecution"; and (4) the decision as to "whether (and how) to put on a defense."  509 U.S. at 398 (internal quotations and citations omitted).  However, many of these choices fall in the very areas in which Dr. Siegel acknowledges minimal or zero progress with Rodriguez during the competency

20

restoration process. (N.T. 120:16-125:17 (stating that there was no discussion on the decision to take the stand and no understanding of the concept of plea bargaining).)  As a result of Rodriguez's limited comprehension in these areas, we are not at all confident that Rodriguez will possess the knowledge required for rationally making the critical decisions required of a criminal defendant.

But Rodriguez's limited understanding is just one of a series of impairments that serve as significant hurdles to Rodriguez's ability to make decisions.  Because of his limited understanding of important abstract concepts, Rodriguez frequently cannot acquire the information necessary to make a rational decision.  Even if Rodriguez managed to learn an abstract concept despite his difficulties, his memory lapses may make him forget the concept before the time for decisionmaking.  (Dr. Samuel Report 6; Dr. Dattilio Report 8-9.)  Even if Rodriguez retained his knowledge of a given abstract concept, he will have difficulty applying that concept to his own situation because he lacks the ability to examine the negative consequences of a decision and thus cannot discern the true risks of a particular course of action. (N.T. 99:23-100:23.)  Finally, even if Rodriguez had the ability to retain and apply an abstract concept, he would likely defer to the advice of his attorney despite any desire to undergo a different course of action.  (Id. at 40:19-41:9.)  Because of these hurdles, Rodriguez is incapable of making the decisions that criminal defendants must necessarily make and is incapable of assisting his attorney in making the strategic decisions that inevitably arise.

An interaction that occurred at the competency hearing between the prosecutor in this matter, Leo Tsao ("Tsao"), and Rodriguez demonstrates some of the hurdles that stand in the way of Rodriguez's ability to make decisions.  Tsao tried to establish on cross-examination that

Rodriguez was capable of learning new legal concepts and applying them in his case.  The

following dialogue took place:

| | |
|---|---|
| Tsao: | Mr. Rodriguez, I am the prosecutor.  If I told you that you yourself could help pick the jury -- |
| Rodriguez: | Huh? |
| Tsao: | Do you understand that you could help pick the jury? |
| Rodriguez: | No, I didn't know that I could.  You mean I can -- I can pick it? |
| Tsao: | Yes.  Now that I've told you that, do you understand that out of many people you could help to decide what people you would want on the jury? |
| Rodriguez: | That I can put them there? |
| Tsao: | Yes.  Do you -- now that I've told you that, do you understand that you can do that? |
| Rodriguez: | You want me to put the people there? |
| Tsao: | Help to pick who goes there, yes. |
| Rodriguez: | Okay. |
| Tsao: | Okay.  What if I told you that at trial you could actually tell the jury your own story?   Would you understand that?  You could decide whether to tell the jury your own story. |
| Rodriguez: | But to whom?  There's no people there. |
| Tsao: | Yes, when the jury is selected, at trial you could do that.  If I told you that, do you understand that? |
| Rodriguez: | If you ask for it, I guess so.  You know, I guess that would be it if you asked. |
| Tsao: | No, but do you understand you could do that? |
| Rodriguez: | Whatever you say, whatever you want. |

(N.T. 138:1-139:1.)  This testimony demonstrates Rodriguez's difficulty in grasping abstract

concepts and his deferential acceptance of the statements of more intelligent people.  Because of

these limitations working in concert, Tsao could not get Rodriguez to truly comprehend his

ability to pick a jury and tell them his side of the story.  It appears that this and similar

interactions with Rodriguez throughout the hearing contributed to the Government's recognition

that the competency issue "is a close question."  (Gov't Mem. Supp. Mental Competency 2.)

But we do not find the issue to be close at all.  Without being able to understand the concept of picking a jury, Rodriguez would not be able to effectively participate in any rational decisionmaking process with his lawyer at the jury selection stage of trial.  Similarly, Rodriguez's inability to apply other abstract legal concepts—such as bargaining a plea agreement or deciding whether to testify in his own defense—prevent him from participating in decisionmaking at other critical stages of his case.

Finally, we have reservations about the efficacy of competency restoration where the defendant suffers from cognitive and intellectual deficiencies such as those presented by Rodriguez.  The concept of competency is a broad one, and although tests like the CAST*MR have been developed to help test for competency, such tests are not ultimate diagnostic tools. (N.T. 43:7-13, 85:16-21.)  Dr. Siegel even acknowledged that Rodriguez was the first patient he had evaluated using the CAST*MR and that he probably would not have used it if the other experts had not already done so.  (Id. at 85:23-86:21.)  Rather, professionals assessing competency must take into consideration their own judgments and observations of the defendant as part of their evaluation, making any determination of competency a rather subjective inquiry. (Id. at 43:7-13, 86:22-87:8.)

Moreover, the field of competency restoration is just beginning to develop standards to measure success or failure in restoring a defendant's competency to stand trial.  (Id. at 42:11-23.) But even assuming that success has been adequately defined and can be consistently measured, competency restoration is most effective with defendants who can be easily treated with medication.  In contrast, defendants with "irremediable cognitive disorders" present one of the greatest challenges for competency restoration and have the least promising chance of success.

See Douglas Mossman, M.D., Predicting Restorability of Incompetent Criminal Defendants, 35 J. Am. Acad. Psychiatry Law 34 (2007).  This difficulty in restoring the competency of mentally retarded individuals was confirmed by both Dr. Sadoff and Dr. Siegel at the competency hearing. (N.T. 43:14-24, 77:5-14.)  After all, we question how treatments can claim to *restore* competency where it never actually existed in the first place.

> For all of these reasons, we find Rodriguez to be incompetent to stand trial.  Rodriguez's incompetency results from permanent cognitive and intellectual disabilities that severely inhibit his ability to assist his attorney in his own defense.  Any attempt at restoring Rodriguez's competency has failed as neither medication nor education can cure his disabilities making the restoration of persons with low cognitive functioning particularly challenging.  Because we find Rodriguez incompetent, we must "commit the defendant to the custody of the Attorney General" who:

> shall hospitalize the defendant for treatment in a suitable facility (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and (2) for an additional reasonable period of time until (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or (B) the pending charges against him are disposed of according to law; whichever is earlier.

18 U.S.C. § 4241(d).

III.    CONCLUSION

> Accordingly, we find that Defendant Rodriguez is not competent to stand trial.

Therefore, we commit him to the custody of the Attorney General.

24